[No. 10193.   Department Two.   July 2, 1912.]

ADA STELLA JOHNSTON et al., Respondents, v. SUPERIOR PORTLAND CEMENT COMPANY, Appellant.[1]

MASTER AND SERVANT—INJURIES—SAFE PLACE AND APPLIANCES— TUNNEL—AIR FAN—NEGLIGENCE—EVIDENCE—SUFFICIENCY. The evidence is insufficient to sustain a verdict for the wrongful death of an employee, asphyxiated in a tunnel through the alleged insufficiency of the fan supplying fresh air to the workings, where it appears that the fan was under the control of the deceased, who understood it and turned it on or off as desired, that when his body was found, the fan was not working, and he either entered the tunnel in the morning without turning on the fan to clear out the foul air, or turned it off too soon, that the fan was in working order the night before and shortly after he was found, and if left running long enough, it furnished sufficient fresh air, no complaints of it having been made; and failure to use reasonable care is not shown merely by the evidence of a witness that sometimes the air was pretty bad and made him drowsy and weak in the knees, or by the fact that it took from half an hour to an hour and a half to clear out the air after shots.

FULLERTON, J., dissents.

Appeal from a judgment of the superior court for Skagit county, Kellogg, J., entered October 25, 1911, upon the verdict of a jury rendered in favor of the plaintiffs, in an

[1]Reported in 124 Pac. 1119.

action for the wrongful death of an employee in a quarry. Reversed.

*Ira Bronson,* for appellant.

*J. L. Corrigan* and *M. P. Hurd,* for respondents.

Morris, J.—Respondents brought this action to recover damages for the death of Robert O. Johnston, husband and father of respondents, which death it is alleged was caused by the negligence of appellant while the deceased was employed in the construction of an upraise from the breast of a tunnel in appellant's quarry. Negligence was charged in several particulars, among which was that the work was unnecessarily hazardous, for the reason that the upraise was being extended upward from the breast of the tunnel instead of sinking a shaft from the surface downward; that the only means for providing the workings with a supply of pure air was an inadequate and improperly constructed fan, which was out of order at the time; and that the appellant, knowing these defects, directed the deceased, who did not apprehend the danger, to enter the workings, which were filled with noxious gases, causing his death. The appellant denied any negligence on its part, and alleged that the deceased met his death through his own negligence in failing to operate the fan, which was part of his duty; and also pleaded that the work in which deceased was engaged at the time of his death was being done by an independent contractor in whose employ the deceased was, and not in the employ of appellant. The trial resulted in verdict and judgment for respondents.

Appellant submits two contentions upon which it relies for a reversal: (1) That there was no proof of negligence; (2) that its defense that the work was being done by an independent contractor was so absolutely established as to leave no question of fact to submit to the jury, and that the court should have so held, as a matter of law, upon its mo-

tion for judgment.  A careful reading of the record compels the conclusion that each of these contentions must be sustained.

The conceded cause of the death of deceased was asphyxiation, and the evidence upon which it is sought to establish negligence was directed against the fan employed to furnish the workings with sufficient pure air to make them reasonably safe.  The tunnel from which the upraise was being extended was about seven feet high, and of equal width, and ran into the mountain side about two hundred feet.  The upraise was about four and one-half feet by eight feet, and ran upward at an angle of forty-five degrees from the breast of the tunnel.  At the time the deceased met his death, it had been extended about sixty feet.  The fan was operated by an electric motor set in the rear end of the tunnel.  It was about six feet high, four feet long, and one and one-half feet wide, and was located about twelve feet from the motor.  There was a six-inch galvanized iron pipe running from the fan to the mouth of the tunnel, and another pipe running upward into the upraise, up to within a few feet of the bulkhead supporting the breast of the upraise.  The fan was set in motion by the men themselves when they so desired, by throwing a switch; and when in motion, a stream of pure air was forced through the galvanized iron pipes against the breast of the upraise where the men were at work.  The work was being done by drills, working under an air pressure of from ninety to one hundred pounds, which came through a compressor pipe to which the drills were connected by a hose.  This air was controlled by a valve at the side of the drills.  When the drills were not being used, the air was left on.  The work was being done by a day and night shift of two men each.

The deceased, at the time of his death, was in charge of the day shift.  When he went to work, he was instructed in the use of the fan, how to operate it by throwing the switch; and it is shown that he understood how to set the fan in

motion, and had done so on previous occasions. There is no evidence that this method was inadequate to furnish the workings with sufficient pure air to make the place reasonably safe. It does not appear that any complaint was ever made, nor that there was any occasion when the supply of air was found insufficient, nor that the men ever found it necessary to quit work because of the insufficiency of the air supply. There is no evidence at all from which even an inference of these or kindred facts could be drawn. The only evidence attacking the plan of supplying air to the workings, or the adequacy of the method adopted, is that one witness says: "Once in a while they had pretty good air; sometimes it was pretty bad," and the witness had felt drowsy and weak in the knees. This witness was one of the night shift who left the workings just previous to the entry of the deceased on the day of his death. On that night he says he felt no bad effects from the air. Another witness says the fan was not installed in the usual way; that it blew in instead of sucking out, and that it did not draw out the smoke very well after blowing the holes, but it would if it ran long enough, and that it was generally let run until the smoke was cleaned out, which would be "possibly an hour, an hour and a half or half an hour." Then, in response to the question, "Would that clear the air out all right?" he answered: "I don't know really much about this place. I didn't work there very long. I didn't have much experience with it." He also adds that, no matter how long the fan ran, the air in the upraise was not as pure "as it was outdoors." Another witness, who found the deceased on the day of his death, says, at the time he "noticed something peculiar about the atmosphere in there," and detected gas, but that it was not very strong and he felt no "bad effects from it."

The deceased met his death on Wednesday morning, and an attempt is made to show the fan was out of repair by a witness who testifies that there was no change in the condi-

tions of the air pipes, nor the location of the fan between Wednesday and the following Monday, and that on Monday he "saw only one of the electric wires were cut and put down under the pipe and spliced, and the other was cut and had not been spliced, and the other was the same as when we left;" that the wire that was spliced was used to carry the current from the motor to the fan, and that "these changes made a difference in the way the fan was operated." It does not appear what "this difference" was; nor does this testimony in any way tend to show the fan was not in working order on Wednesday morning. In fact, the contrary appears. One of the witnesses who testified worked the night shift previous to the morning on which deceased came to his death. He does not testify that there was any trouble with the fan, nor that it was not in good working order. All he says is that, when he and Murray, who was in charge of the night shift, left the upraise after shooting fifteen holes, he asked Murray if he should turn on the fan, and Murray said no. The only evidence as to the condition of the fan on Wednesday morning is from one of the witnesses who went into the upraise to remove the deceased shortly after he was found; and within a half or three-quarters of an hour from that time, he started the fan and found the power on and the fan in working order. This evidence falls far short of supporting the allegation that the fan was inadequate for the purpose for which it was used, or that it was not in working order, or that its inefficiency or failure to work contributed to the death of deceased.

The men themselves operated the fan. No one had anything to do with turning it on or off except themselves. The night shift sometimes, after firing shots, turned on the fan to clear out the smoke and effects of the shots, when they left in the morning. The day shift, when they came to work, if they found it not running, turned it on if they so desired, and the deceased had been instructed how to do so and had done so. There can be no question but that he fully

understood the operation of the fan. If, in the light of the evidence, a conjecture is to be made as to how or why death came to the deceased, no other inference can be drawn than that the air in the upraise was foul because of the fifteen shots fired by the night shift. They failed to turn on the fan and clear it out. When deceased and his helper came to work, they failed to turn on the fan, and went into the workings and were overcome by the foul air before they realized their danger. The negligence was that of the man in charge of the night shift, or of deceased himself. If it was that of the man in charge of the night shift, it could not be charged against the appellant. If appellant's theory is the true one, Murray, who was in charge of the night shift, was an independent contractor who had joined with another contractor, McInroy, in taking a contract from appellant for the construction of this upraise. McInroy, who was ordinarily in charge of the day shift, had gone to Seattle some days before and placed the deceased in charge of the day shift. Murray's negligence under these circumstances could not bind the appellant. If the work was not being done by an independent contractor, as respondents contend, then the negligence, whether it was chargeable to Murray or to the deceased or to both, could not bind the appellant. The record furnishes no way of escape from these conclusions, and the court below should have so ruled.

Respondents contend that any inference which may reasonably be drawn from proven or admitted facts is just as competent to establish negligence as the facts themselves. It may be admitted that such is a correct statement of the law. There is here, however, no fact from which an inference of negligence may be deduced. We must first have the fact established before we can draw an inference from that fact. The law does not impose upon those in charge of underground workings any other duty that ordinary prudence and reasonable safety. It is not required that the air therein shall be as pure at all times as it is on the surface; nor does

the fact that a workman has felt drowsy and weak in the knees prove the insufficiency of the air supply. Such may be the fact under conditions of ordinary prudence and reasonable safety. It may be assumed that in all such places, with the best possible conditions, the air will sometimes produce drowsiness and fall short of the purity of the surface air. To hold such evidence sufficient to establish negligence, is to create a standard impossible to comply with. It is not the test of reasonable safety required by the law. Nor does the fact that the fan required from one-half to an hour and a half to remove the bad effects of the shots establish negligence. If it proves that the fan worked slowly, then the men knew it and should have governed themselves accordingly. Negligence in such respects cannot be established by fixing a measure of time in which the fan must perform its work. The law knows no such measure. There is no evidence that this would be a longer time than should be required, even if there was. The necessary time was known and, if the men chose to enter the workings without giving the fan the required time to remove the bad air, they must accept the responsibility of such an act. There is not a syllable of testimony that the deceased, on the morning of his death, was directed to enter this tunnel upon any assurance of safety, or that any one attempted in any way or to any extent to influence his judgment as to whether or not it was safe to enter, or whether or not it was necessary or advisable to operate the fan. We simply know the fan was not working at the time the deceased was found, and that it would work when the switch was thrown shortly after he was found. Whether he entered the upraise without turning on the fan under the belief that Murray had cleaned it out, or did turn it on but had stopped it thinking it had run sufficiently long to clean out the upraise, cannot be determined. One or the other was the fact. In either case appellant cannot be charged with his act or his failure to act. These con-

clusions seem to us irresistible, and we cannot escape them, much as we dislike to set aside a verdict in such a case.

Having reached this conclusion, it is not necessary to discuss the question of independent contractor, as what has been said establishes the error of the court in not granting the motion for judgment notwithstanding the verdict.

The judgment is reversed, and the cause remanded with instructions to dismiss.

Mount and Ellis, JJ., concur.

Fullerton, J., dissents.